IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

15-7611

MICHAEL DUNHAM,

*Petitioner-Appellant,*

v.

JOSEPH McFADDEN,

*Respondent-Appellee,*

_____

INFORMAL BRIEF
_____

## <u>INTRODUCTION</u>

Michael Dunham's request for relief is compelling and should be granted. He has shown in state court proceedings he is innocent of the charge for which he is serving life without parole in state prison.

At his state post-conviction relief hearing, Dunham established a solid alibi and presented a witness who definitively testified he was not involved in the murder. There was no evidence to the contrary. The decision of the state court to deny his post-conviction relief was

unreasonable in both its view of the facts and its application of the Sixt

Amendment right to effective assistance of counsel.

## JURISDICTION

Michael Dunham is a prisoner in South Carolina state custody. Dunham filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254 in the United States District Court, District of South Carolina, on August 1, 2014. Pursuant to that statute, jurisdiction was proper in the district court.

The district court granted summary judgment on Dunham's claim on September 10, 2015. A notice of appeal was filed on October 9, 2015. This timely notice of appeal gives this Court proper jurisdiction over this case.

## CERTIFICATE OF APPEALABILITY

The district court did not issue a certificate of appealability.

## ISSUES ON APPEAL

1.   **THE DISTRICT COURT'S DETERMINATION THAT TRIAL COUNSEL WAS EFFECTIVE WAS INCORRECT.**

## PROCEDURAL HISTORY

Petitioner Michael Dunham was charged with murder in the Charleston County Court of General Sessions. He was convicted by a jury on February 15, 2006, and sentenced to life without parole.

Dunham appealed his case to the South Carolina Court of Appeals. The Court of Appeals affirmed his conviction and sentence on March 24, 2010. He then filed an application in the Charleston County Court of Common Pleas for post-conviction relief (PCR) on January 25, 2011.

Dunham's PCR was dismissed with prejudice and he filed a petition for a writ of certiorari from that decision. The Supreme Court of South Carolina denied the petition for a writ on June 25, 2014.

Dunham filed a petition for a writ of habeas corpus in the United States District Court on August 1, 2014. The Respondent filed a motion for summary judgment on October 15, 2014. The district court granted the motion on September 10, 2015.

## ARGUMENT

## 1.    THE DISTRICT COURT'S DETERMINATION THAT TRIAL COUNSEL WAS EFFECTIVE WAS UNREASONABLE.

Dunham is aware this Court reviews this appeal with a high level of deference to the underlying state court decision. *DeCastro v. Banker,* 642 F.2d 442, 449 (4th Cir. 2011). However, that deference does not call for the abandonment of judicial review and does not prevent the courts from granting relief to a habeas petitioner. *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003).

This Court has recognized it should not just rubber-stamp a state post-conviction decision; it must instead fulfill a meaningful role in safeguarding the constitutional rights of state prisoners. *Elmore v. Ozmint,* 661 F.3d 783, 872 (4th Cir. 2011).

## Facts developed at the PCR hearing in state court

### Testimony of Petitioner Michael Dunham

Dunham's PCR hearing took place on September 15, 2011. (DE 11-6, p.13) Dunham testified on his own behalf at the hearing.

Upon his arrest, Dunham informed his trial counsel almost immediately that he had an alibi witness for the time of the murder. (DE 11-6, p.24, ll.4-18) The Friday before Dunham's trial began, he met with his trial counsel and once again discussed the alibi witness. (DE 11-6, p.25, ll.1-10) The alibi witness was never called to testify. (DE 11-6, p.25,

4

ll.11-18) Dunham testified he was told it was a decision by trial counsel not to call the alibi witness because she would harm their case, rather than help. (DE 11-6, p.26, ll.9-20)

Dunham also testified Michael Jeter was a co-defendant in his case, but he was not tried at the same time. (DE 11-6, p.26, l.23 – p.27, l.4) The State did not cross-examine Dunham at the PCR hearing. (DE 11-6, p.27, ll.10-11)

Testimony of Michael Jeter

Dunham called Michael Jeter to testify at his PCR hearing. Jeter was charged with murder based on the same incident for which Dunham was convicted. Jeter went to trial after Dunham and did not deny his presence at the shooting. (DE 11-6, p.28, ll. 8-15) Jeter described the details of the fight which led to the shooting.

Jeter got into a fight with the victim of the murder. (DE 11-6, p.29, ll. 6-8) After the fight, Jeter placed a call to a friend to let him know about the fight. (DE 11-6, p.29, ll. 9-12) Jeter made two calls to a phone number provided by a friend of his named Brandon Cuttino. (DE 11-6, p.29, ll. 9-21) Jeter identified the two calls he made on State's Exhibit 52 from the trial, which reflected calls at 4:33 p.m. and 4:35 p.m. the day of the

shooting. (State's Ex. 52 is located at DE #11-3, p.68 (the exact calls are at line numbers 29-30 on the call sheet)) Jeter did not know Dunham at the time he made these phone calls. (DE 11-6, p.29, ll.22-23)

Jeter was picked up shortly after the phone calls by Steven Johnson, not Michael Dunham. (DE 11-6, p.30, ll.21-22) Steven Johnson was also charged with the murder. (DE 11-6, p.30, ll.23-25) Jeter was able to recognize Johnson as the man that picked him up because he had seen Johnson in bond court and Johnson testified against Jeter at Jeter's trial. (DE 11-6, p.30, ll.19-22; p.31, ll.1-6) Johnson admitted to his knowledge of what was going on at the scene when he testified at Jeter's trial, though Johnson was never asked if he was in the car that picked up Jeter. (DE 11-6, p.31, ll.3-9)

Jeter expected to testify at Dunham's trial. Jeter testified he was under the impression he would describe the events surrounding the shooting to clarify what actually happened. (DE 11-6, p.32, ll.3-17) The PCR court asked him for clarification and Jeter answered he would have testified that he was with Steven Johnson, not Michael Dunham. (DE 11-6, p.32, ll.18-22)

6

Jeter was willing to testify at Dunham's trial. (DE 11-6, p.33, ll.3-10) He would have testified that while he (Jeter) was present at the shooting, Dunham was not. (DE 11-6, p.33, ll.11-16) Jeter was tried for this murder a month after Dunham. After the State rested its case against Jeter, he entered a plea to voluntary manslaughter and was sentenced to 30 years suspended on 15 years of service. (DE 11-6, p.34, ll.1-17)

Jeter was very clear at the PCR hearing that he would have testified at Dunham's trial if he had been asked. (DE 11-6, p.34, ll.21-25) When cross-examined by the State, Jeter explained why he made a statement that Dunham was the person that picked him up after the fight and immediately before the shooting. Jeter explained that the police told him the person who picked him up was Dunham, but that he never knew Dunham and it was actually not Dunham who picked him up. (DE 11-6, p.35, ll.18-23) Jeter insisted that after he was able to identify all of the parties involved in this case, he realized it was Steven Johnson that picked him up from the fight, not Michael Dunham. (DE 11-6, p.35, ll.9-20)

Jeter never denied his involvement in the fight or his presence at the shooting. He made a statement to law enforcement that he was there and proceeded to his own trial without recanting or changing that statement. He was aware that he had the right to decide whether he would testify in Dunham's trial and confirmed he would have testified in order to make sure an innocent man did not go to prison. (DE 11-6, p.38, ll.2-12)

<u>Testimony of Victoria Martin</u>

Dunham also called Victoria Martin to testify at the PCR hearing. Martin testified she specifically remembered the day of the shooting. (DE 11-6, p.39, ll.9-17) She was in a romantic relationship with Dunham at the time and he came to her house most days. (DE 11-6, p.39, ll.18-24) Dunham and Martin were in a sexual relationship and he would stay at her house between 2 p.m. and 5 p.m. on the days he visited her. (DE 11-6, p.40, ll.2-8)

On the day of the shooting, Dunham came to Martin's house after 2 p.m., which was when she got out of school. (DE 11-6, p.40, ll.9-17) Martin was able to remember precise times regarding Dunham's arrival and

departure from her house based on the schedule of her siblings and mother.

Martin's siblings came home from school around 4 p.m. (DE 11-6, p.41, ll.5-15) Dunham was still at the apartment when they arrived. (DE 11-6, p.41, ll.16-18) Martin remembered Dunham leaving her apartment around 5 p.m. because her mother would be returning from work after 5 p.m. (DE 11-6, p.41, ll.19-23) This testimony, which could have been offered at trial, firmly established Martin could provide an alibi for Dunham at the time of the shooting.

In addition to alibi testimony, Martin would have been able to clarify ownership of the phone Jeter called after the fight. These calls were critical. In addition to establishing the time frame of the shooting, the calls were made to the person who arrived to pick up Jeter. It was this person who shot the victim.

According to the phone records, Jeter called a specific number after the fight. (DE 11-6, p.42, l.25 – p.43, l.1) Martin testified this number was not Dunham's phone number. She spoke with him nearly every day during this time and was very familiar with his number. (DE 11-6, p.43, ll.2-8) Martin testified the phone in question was never in Dunham's

possession and actually belonged to a young man named Justin Lemmon. (DE 11-6, p.42, ll.13-24)

Testimony of Dunham's trial attorney

The public defender assigned to handle Dunham's case testified that he was not aware Jeter would testify Dunham was not present at the shooting, but also admitted he had not tried to contact Jeter or his attorney to determine Jeter's version of events. (DE 11-6, p.53, ll.19-24; p.54, ll.1-11)

The trial attorney never asked to speak directly with Jeter, though he admitted he would have tried to meet with him if he suspected Jeter had exculpatory information. (DE 11-6, p.64, ll.1-7) While the attorney anticipated some of Jeter's defense, he was unaware of what he would have said if interviewed. (DE 11-6, p.64, ll.7-11) He admitted he would have put him on the stand in the trial if he had known what Jeter would say. (DE 11-6, p.64, ll.17-20)

The trial attorney also testified about the alibi and why he did not call Victoria Martin. He testified his notes reflected Dunham arrived at the apartment between 4 and 5 and was then in and out for the rest of the evening. (DE 11-6, p.51, ll.21-24) The trial attorney felt Dunham

10

would need to testify in addition to the alibi witness. (DE 11-6, p.57, ll.5-13)

Dunham's trial attorney felt it was better to present no alibi than to present a weak alibi. (DE 11-6, p.57, ll.14-15) The PCR court added that it would not be worth presenting an alibi if the defendant does not testify. (DE 11-6, p.61, l.23 – p.62, l.4) It appears the trial attorney also thought the alibi reflected in his notes was a stronger alibi than the testimony presented at the PCR hearing from Victoria Martin. (DE 11-6, p.62, ll.5-12)

Neither the trial attorney nor the PCR judge understood the relevance of the phone calls which showed the time of the shooting. With this information, the alibi became critical, regardless of whether Dunham testified or asserted his constitutional right to remain silent.

<u>Ruling from the PCR Court</u>

The PCR court found Jeter's testimony incredible and Martin's testimony as not establishing a proper alibi. The court found Dunham's trial attorney credible, though nothing he said actually disputed any of the evidence put forward by Dunham at the PCR hearing.

The written order from the PCR court was similar to the ruling from the bench. The written order similarly reaches conclusions of both fact and law that are not supported by the record.

## Trial counsel was ineffective for failing to call an alibi witness

Victoria Martin was prepared to testify that Dunham was with her at the time of the shooting. Trial counsel's position on her testimony reflects a fundamental misunderstanding of the timing of the shooting, as well as the relative times covered by the alibi.

The timing of the shooting was critical. Michael Jeter testified about the fight which triggered the shooting. Jeter made a call after the fight looking for a ride away from the area. Phone records established two calls were made to a number at approximately 4:33 p.m. and 4:35 p.m. As trial counsel pointed out, Dunham had always maintained he was not at the scene of the shooting. (DE 11-6, p.58, ll.3-6)

The relative geographic positions of the shooting and the apartment complex where Victoria Martin lived present a clearer picture of the importance of the time line in this case. This Court can take judicial notice of a map. *United States v. Foster,* 662 F.3d 291, 295 n.6 (4th Cir. 2011); *United States v. Castellanos,* 716 F.3d 828, 841 n.7 (4th Cir. 2013).

The address for Victoria Martin's Marshview Apartment Complex residence is listed on the notice of alibi defense. (DE 18, Exhibit 1) The shooting occurred at the 4600 block of West Montague Avenue in North Charleston. (DE 11-1, p.103, ll.20-23)

Google Maps is an acceptable source of information for judicial notice. *Castellanos, supra.* That website reflects the distance between the shooting and the apartment complex was 5 to 6 miles and would involve a 10 to 15 minute drive. This is important because an alibi establishing Dunham's presence at the Marshview Apartment Complex up to 5 p.m. would firmly establish Dunham could not have been involved in the shooting.

Martin testified at the PCR hearing that Dunham was with her from 2 p.m. to approximately 5 p.m. She was willing to testify to that fact during trial, but trial counsel did not speak with her during the trial. It appears trial counsel did not assign any importance to the time line, as he claimed the alibi he thought Martin would testify to was stronger than the one she testified to at the PCR hearing. It is unclear why he thought this, as either version of the alibi would have covered the time of the shooting.

13

The state PCR court missed the importance of this testimony. The court initially thought the shooting took place in the apartment complex, which was incorrect. (DE 11-6, p.67, ll.10-13) Either version of the alibi supports Dunham's claim of innocence. PCR counsel pointed out that Martin's testimony as to when Dunham left her apartment was consistent with trial counsel's notes, as in either event Dunham was with Martin up to 5 p.m. In fact, the PCR court noted for the record that it accepted the testimony that Dunham was still at the apartment complex at 5 p.m. (DE 11-6, p.68, ll.15-18) This factual finding alone established that Dunham could not have been involved in the shooting.

The PCR court's treatment of this issue in its order of dismissal is unreasonable. The court determined that if Dunham did not testify, the presentation of an alibi witness would create a "credibility gap", though the reasoning behind that statement is unexplained. (DE 11-6, p.104)

While the PCR court recognized that Dunham's position at trial was that he was not involved in the shooting, it inexplicably determined that presenting a witness who could firmly establish that fact was not plausible.

14

This decision was unreasonable. There is no requirement that a defendant testify he was not present at the scene of a crime in order to support an alibi established by another witness who had no involvement in the crime. In fact, the corroboration required for this alibi was already in the record. Based on the phone calls introduced by the State, the timing of the shooting, and the presence of Dunham miles away around the time of the shooting could not have been reconciled. His testimony was entirely unnecessary to add to the alibi, as physical evidence in the form of phone records supported Martin's alibi testimony.

Even if the trial attorney believed Martin would have testified to the version of events he referenced, the phone calls would have corroborated the alibi. Nothing in the law requires a defendant to testify in order to properly present an alibi witness. In fact, such a requirement would fly in the face of basic trial practice. Dunham had an absolute constitutional right to decline to testify. His attorney, on the other hand, had an absolute constitutional duty to assert a valid, corroborated defense. The failure to do so falls well below an objectively reasonable standard of effective assistance of counsel.

The PCR court never made a determination that Martin was not a credible witness. In fact, the court seemed to believe her testimony. Even crediting the attorney's recollection of an interview, the court did not dispute Martin would have testified Dunham was at her house from 4 p.m. to 5 p.m. The PCR court found that calling an alibi witness if Dunham did not testify would somehow weaken the alibi. There is no support for this in the record or in the laws of this country and this decision was unreasonable.

## Testimony of Michael Jeter established Dunham was not present at the shooting nor was he involved in the shooting.

The PCR court found that the failure to investigate Jeter's testimony was not ineffective assistance of counsel, as there was nothing to suggest he would testify favorably on behalf of Dunham. This finding was unreasonable.

The PCR court found that Jeter's testimony would not have been exculpatory.  (DE 11-6, p.108) This is an unreasonable determination. The facts presented in the PCR court were unopposed. Jeter testified that he would have stated Dunham did not pick him up before the shooting.

Jeter testified he was brought to the courthouse every day of Dunham's trial and expected to testify that he was not at the shooting.

Jeter never denied his presence at the scene of the shooting. He made a statement to law enforcement that he was there. He went to trial without denying his presence. There was no jeopardy to Jeter if he testified on behalf of Dunham. While the PCR court claimed it was unlikely Jeter's lawyer would have allowed his cooperation with Dunham's defense counsel, there is nothing in the record to support this ruling. Jeter testified it was his decision to assist Dunham and he would have been happy to do so. Jeter's attorney was not called to testify. In fact, the State talked with the attorney and elected not to compel his attendance at the PCR hearing. While the State had the power to call the attorney as a witness, it elected not to.

The PCR court seemed to make its ruling based on nothing more than its opinion of the local attorneys and their various working relationships in the Charleston area. (DE 11-6, p.74, ll.9-12) There was no testimony that it was a common practice not to allow other attorneys to talk to clients regarding a defense.

17

In explaining its ruling, the PCR court made a number of statements that were not supported by the record. The court opined that Jeter and Dunham were friends, which was not true. (DE 11-6, p.75, ll.19-21) Jeter testified he did not know Dunham. (DE 11-6, p.29, ll.22-23) In the same breath, the PCR court then stated that it was certainly possible for people to testify on another's behalf even in the face of great jeopardy, if it was "just the right thing to do." (DE 11-6, p.75, ll.21-25) The PCR court incorrectly stated that Jeter was not sure he would testify on Dunham's behalf. Jeter testified he was entirely willing to do exactly that.

This Court has recognized it is not ineffective assistance of counsel to fail to interview witnesses *when it was clear the defense counsel was well aware of what those witnesses would say*. *Turner v. Williams,* 35 F.3d 872, 898 (4th Cir. 1994); *DeCastro v. Branker,* 642 F.3d 442, 452 (4th Cir. 2011); *Huffington v. Nuth,* 140 F.3d 572, 580 (4th Cir. 1998).

When an attorney does not know what a witness will say, it is imperative to interview that witness. This Court recognizes that merely reviewing discovery in lieu of further witness interviews is deficient performance. *Hoots v. Allbrook,* 785 F.2d 1214, 1219-20 (4th Cir.

1986)(court found counsel's performance deficient, but also found there was no prejudice to the defendant). Though the Fourth Circuit in *Hoots* found no prejudice, the same decision would not apply to the facts of this case. Because *Hoots* involved minor discrepancies, interviewing the witnesses would not have changed the outcome of the case. Jeter's testimony, on the other hand, would have demonstrated that Dunham was not the one present with him at the shooting. The testimony would have been stronger in light of the fact the person who actually was present, Steven Johnson, had initially been charged in the shooting.

It is irrelevant that Jeter was represented by counsel. There was no testimony that his counsel would not have allowed him to speak to Dunham's trial counsel. Jeter actually testified that speaking with Dunham's counsel would have been his decision and he would have elected to help Dunham. Even if Jeter's attorney had testified, he would have had to acknowledge that the decision to cooperate with Dunham would remain with Jeter. The PCR court's decision that this would not have happened must be disregarded, as it is based on pure speculation and is in direct conflict with the testimony of Jeter at the PCR hearing.

19

It is entirely unreasonable to credit a court's speculative opinion, unsupported by any evidence, over actual live, unopposed testimony.

The PCR court's decision that evidence in contrast with the trial testimony of a witness who was initially a suspect in the crime would not be credible is also unreasonable. It is the conflict with the State's witnesses that must be presented at trial. Dunham was under no obligation to discard valid evidence merely because the State said something different. Just the opposite is true. In fact, it is the heart of an adversarial system.

Jeter testified his initial statement to police was true. His only change was that he was provided the name Michael Dunham by the police. After learning who everyone was, Jeter realized the actual person who picked him up was Steven Johnson.

It appears Steven Johnson was the source of the incriminating testimony against Dunham. Imagine the way this trial would have looked with eyewitness testimony that it was Johnson, not Dunham, who committed the crime. Dunham presented such testimony at the PCR hearing and not a single witness or piece of evidence was presented in

opposition to his claim. If ever there was a case deserving of relief, it is this case.

This Court should reverse the decision of the district court and grant habeas relief. The state PCR court applied federal law in an objectively unreasonable manner and relief is warranted. *Renico v. Lott,* 559 U.S. 766, 773 (2006). Relief is appropriate because the decision was not only incorrect, but it was unreasonable. *Id.*

The Sixth Amendment to the United States Constitution clearly establishes the right to effective counsel as a fundamental condition of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 684-86 (1985). Dunham must prove his trial counsel's performance was not objectively reasonable considering the circumstances of his case and the prevailing professional norms. *Id.,* 688-89. He must also show that without these errors, there is a reasonable probability the trial would have ended with a different result. *Id.,* 694.

Dunham has made both showings. Two witnesses that would have testified in his favor were sitting in the courthouse during his trial. Both of those witnesses would have firmly established he could not have been involved in this murder.

The PCR court's dismissal of all of the evidence placed before it, with no factual or legal support, was unreasonable.

## CONCLUSION

Dunham has shown the decision not to grant post-conviction relief was both an unreasonable determination of facts in light of the evidence presented to the PCR court and an unreasonable application of the Sixth Amendment to his case.

The order of the district court denying relief should be reversed and this Court should allow a certificate of appealability and vacate the conviction and sentence of Petitioner Michael Dunham.

Respectfully submitted,

**/s/ Joshua Snow Kendrick**
Joshua Snow Kendrick
419 Vardry Street (29601)
P.O. Box 6938
Greenville, SC 29606
(864) 760-4000
Facsimile (803) 667-3187
Josh@KendrickLeonard.com

November 9, 2015
Greenville, South Carolina

22